IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN CARDENAS,<br><br>　　　　　　Petitioner,<br><br>vs.<br><br>R.T.C. GROUNDS, Warden, Salinas Valley State Prison,[1]<br><br>　　　　　　Respondent. | No. 2:12-cv-01333-JKS<br><br>MEMORANDUM DECISION |

Jonathan Cardenas, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Cardenas is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at the Salinas Valley State Prison. Respondent has answered, and Cardenas has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On December 24, 2007, Cardenas was charged with murder in connection with the March 10, 2007, killing of Gerardo Castillo Ramirez outside an apartment complex on Dana Drive. The information charged that the crime committed was one in which a principal personally and intentionally discharged a firearm and that the crime was committed for the benefit of a criminal street gang. The information further charged Cardenas with two prior felony convictions for which he served prison terms.

On May 14, 2008, Cardenas proceeded to jury trial with his co-defendants Isabel Irene Varela and Jesus Vasquez Trujillo.

---

[1]　　R.T.C. Grounds, Warden, Salinas Valley State Prison, is substituted for Ralph Diaz, former Warden, California State Prison-Corcoran. FED. R. CIV. P. 25(c).

On the evening in question, Castillo Ramirez and his two friends, Rolando Rodriguez and Daniel Ponce, had been drinking at a bar, Mexico Lindo, where they met Varela. The three men and Varela went by taxi from the bar to Dana Drive. According to the prosecution, Varela lured the three men to the apartment complex by telling them she would "party" with them there when she knew that Trujillo and Cardenas were waiting for them at the apartment complex and intended to rob the three men. Trujillo was armed with the murder weapon. When Varela and the three men arrived at the complex, she led the unsuspecting men into the courtyard where Trujillo and Cardenas attacked.

The prosecutor suggested that Cardenas struck Rodriguez on the head with a pry bar which was found at the scene. Rodriguez was hospitalized with a gash to the head that was consistent with a blow from such a weapon. After a struggle, Trujillo shot Castillo Ramirez as he attempted to flee.

Varela and Cardenas admitted in their testimony that they were present at the shooting. Varela said she accompanied the men to the complex unwillingly, forced by Trujillo to do so. The prosecutor did not dispute that Trujillo directed Varela but maintained that she had ample opportunity to cease participating if she had wanted to do so.

Cardenas pleaded self-defense and defense of others. He said he was expecting that Varela would bring only one person rather than three and that Trujillo would then buy methamphetamine from that person. According to Cardenas, Castillo Ramirez and Ponce were the aggressors, attacking Trujillo when he entered the courtyard. As Rodriguez moved to join the fight, Cardenas hit him on the head from behind. Cardenas denied that he used anything other than his fists. He testified that Trujillo ran to the street in an attempt to flee; that Castillo

2

Ramirez caught him and continued to assault him; and that the gun was discharged in the ensuing struggle.  Cardenas said that he remained behind in the courtyard at the time of the shooting and ran out the back onto a bike trail afterward.

According to the prosecutor, the defendants were all members of the Norteno gang and were seeking to victimize the men because they were members of the Surenos, a rival gang.  The prosecutor argued that Mexico Lindo was a Sureno bar.  Cardenas testified that Rodriguez shouted a Sureno gang cry before his companions supposedly attacked Trujillo.  Cardenas therefore suggested that it was Rodriguez and his companions, not the defendants, who came to the scene intending to commit assault and robbery under the pretense of doing a drug deal.  Although Rodriguez himself denied it, it was undisputed among the parties that Rodriguez had a small amount of drugs with him that night and that a nurse at the hospital disposed of them at his request.

At the time of the killing, three homeless persons were encamped in a carport across the street from the apartment complex.  Two of them testified for the prosecution, and both supported the prosecution's version of the killing.  Although they were unable to identify the shooter, they made clear that he was the aggressor and was not defending himself as Cardenas claimed.

Shortly after the crime, the police stopped a car as it reached Cardenas's home.  Steve Young was the driver and Cardenas and Varela were passengers.  All three were arrested.  All testified that Young picked up Varela and Trujillo from the crime scene, dropped them off temporarily at the home of Young's girlfriend, returned to the crime scene to get Cardenas,

3

picked up Varela and Trujillo again at the girlfriend's home, dropped off Trujillo at his sister's apartment, and eventually drove to Cardenas's home.

Cell phone records showed repeated contacts among Young, Trujillo, Cardenas, and Varela before and after the shooting. Young testified for the prosecution as part of a plea bargain after he was originally charged with murder and conspiracy. In return for a promise to testify truthfully, he pled guilty to being an accessory after the fact, with no prison sentence.

After the conclusion of trial, the jury convicted Cardenas, Varela, and Trujillo of first degree murder and found the additional allegations true. On September 9, 2008, Cardenas was sentenced to a total term of 51 years to life: 25 years to life for the murder, a consecutive term of 25 year to life for the gun use enhancement, and 1 year for a prison prior. The court stayed a sentence for the gang enhancement. The court also ordered Cardenas to pay $79,030.01 in restitution, reserved determination of future expenses, imposed a restitution fine of $10,000, and suspended a parole revocation restitution fine of $10,000.

Through counsel, Cardenas appealed his conviction. He argued that: 1) the trial court erred in refusing to sever Cardenas's trial from Varela's; 2) the court erred in sustaining the prosecutor's reasons for excusing a Latina juror; 3) the court erred in failing to dismiss a juror who expressed doubt about being fair due to fears about gangs and guns; 4) the gang enhancements were not supported by legally sufficient evidence; 5) the court erred in admitting gang expert testimony and restricting cross-examination of the expert; 6) the court erred in failing to instruct the jury to view Young's testimony with caution; 7) the cumulative effect of the errors warranted reversal of his conviction; 8) his sentence constituted cruel and unusual punishment; and 9) the court erred in calculating his presentence credits. On March 11, 2011,

4

the California Court of Appeal issued a reasoned opinion in which it modified Cardenas's judgment to correct the calculation of his presentence credits but otherwise affirmed his conviction in its entirety.  Cardenas petitioned for review of the denial to the California Supreme Court, which summarily denied review.

Cardenas timely filed a Petition for a Writ of Habeas Corpus to this Court on May 16, 2012.

## II. GROUNDS/CLAIMS

In his *pro se* Petition, Cardenas raises the same claims he raised on direct appeal: 1) erroneous denial of his severance motion; 2) *Batson* violation; 3) biased juror; 4) legal insufficiency of gang enhancements; 5) improper gang expert testimony; 6) instructional error; 7) cumulative error; and 8) cruel and unusual punishment.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

5

relevant state-court decision." *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Cardenas has not replied to Respondent's answer.  The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true.  *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

*Claim 1.  Erroneous Denial of Severance Motion*

Cardenas first argues that the trial court erred in denying his motion to sever his trial

from Varela's trial.  Cardenas contends that his severance motion was "based on grossly

antagonistic defenses" and that "actual gross unfairness" resulted from the denial.  The Court of

Appeal recounted the following facts underlying Cardenas's motion:

> Before trial, counsel for Cardenas filed a motion to sever Cardenas's trial from
> that of Varela.  Trujillo's counsel joined in that motion, which the prosecutor opposed.
> At a hearing on the motion, Cardenas's counsel stated that, based on evidence presented
> at the preliminary hearing, it appeared that Varela was planning to offer a duress defense
> and that such a defense would be antagonistic to Cardenas's defense.  He further stated,
> "the power of their duress defense is related in an inversely proportional manner to mine.
> [¶]  The more my client looks like a violent criminal and a gang member, the stronger
> Mr. Ogul's [Varela's counsel's] duress defense . . . ."
> Cardenas's counsel then explained that his defense theory at trial "would be that
> this was a drug purchase gone bad that turned into a shooting that was self-defense.  [¶]
> And so my defense theory in that regard would be directly contradicted by Ms. Varela's
> that this was a gang thing, and these guys were lured out there to exact gang vengeance,
> and she was forced to do so by my client and other gang members."  Trujillo's counsel
> then stated that, for purposes of the court's ruling, "we would ask the Court to assume it
> would be the same defense."
> The trial court ultimately denied the severance motion.

The appellate court subsequently rejected the claim:

> Varela's duress defense undoubtedly was antagonistic to the defenses of Cardenas
> and Trujillo.  Nonetheless, abundant evidence of both men's guilt, independent from that
> presented by Varela, was presented at the preliminary hearing, from which the court
> could conclude severance was not required.
> . . .
> As to Cardenas, Young testified that, at Cardenas's request, he picked Cardenas
> up near the scene and eyewitness Miller identified Cardenas in a photo spread as the man
> he saw who ran from the scene.  Young also testified that, from what Cardenas told him
> on the phone before the shooting, Young assumed that "they were setting someone up to
> be robbed."
> There was additional evidence relating to both men.  Ponce and Rodriguez both
> described an unprovoked attack by the two men who arrived at the scene, and Rodriguez
> described someone patting him down as he regained consciousness.  In addition, there

7

was testimony from Steven Young and Detective McCoy that Trujillo, Cardenas, and Varela were Norteno gang members.  McCoy also testified that Mexico Lindo was a Sureno bar.

In sum, there was strong evidence—apart from that introduced by Varela—that Varela, a Norteno gang member, took three men she met at a Sureno bar to a secluded place where Trujillo—armed with a gun—and Cardenas, both Norteno gang members, were waiting.  There was additional independent evidence that Trujillo and Cardenas then assaulted all three men, that one of them attempted to rob one of the men, and that Trujillo fatally shot another one.

Thus, there was sufficient independent evidence against Cardenas and Trujillo to establish that it was not the conflict with Varela alone that demonstrated their guilt.  We therefore conclude that the trial court did not abuse its discretion in denying the severance motion based on the facts as they appeared at the time the court made its ruling.

The United States Supreme Court has never held that a criminal defendant has a federal constitutional right to bifurcation.  *Spencer v. Texas*, 385 U.S. 554, 568 (1967) ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure."); *see also Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) (reaffirming *Spencer*).  Therefore, a court may grant habeas relief based on a state court's decision to deny a motion for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial.  *Zafiro v. United States*, 506 U.S. 534, 539 (1993) (a court must consider whether "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"); *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991) ("The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate.") (internal brackets and citation omitted).

Cardenas bears the burden of proving that he is entitled to federal habeas relief, *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2003), and he must establish that the prejudice arising

from the failure to grant a severance was so "clear, manifest or undue" that he was denied a fair trial, *Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir. 1999) (quoting *United States v. Throckmorton*, 87 F.3d 1069, 1071-72 (9th Cir. 1996)).

Although it does not appear that the Ninth Circuit has directly addressed whether due process may be violated where a trial court refuses to sever trials involving antagonistic defenses, the Second Circuit has answered the question in the affirmative where one of the co-defendants alleges that another co-defendant framed him. *See United States v. Serpoosh*, 919 F.2d 835, 838 (2d Cir. 1990), *overruled by Zafiro*, 506 U.S. at 538. In that case, "Both defendants gave detailed and mutually exclusive explanations of their conduct on the day of the arrest. The damage done was greatly enhanced by the sparring between counsel for the two defendants in which each characterized the other defendant as a liar who concocted the story to escape blame." *Id.*

The Second Circuit later concluded that the Supreme Court overruled *Serpoosh* in *Zafiro*, 506 U.S. at 538. *See United States v. Haynes*, 16 F.3d 29, 32 (2d Cir. 1994). In any event, the defenses involved in this case are not as incompatible as the defenses employed in *Serpoosh*. Varela did not argue that she was not involved in the crime. Rather, this case involved defendants who committed a common crime involving common events and victims. Accordingly, the evidence produced at trial was admissible with regard to all the defendants. This fact reduced the possibility of prejudice to Cardenas. Moreover, as the California Court of Appeal correctly observed, strong evidence apart from any introduced by Varela was sufficient to demonstrate Cardenas's guilt. Under the circumstances of this case, Cardenas has not

established that the state trial court's refusal to bifurcate the trial rendered his trial fundamentally unfair.  *Davis*, 384 F.3d at 638.

Moreover, even if the court's refusal to sever the trials was error, Cardenas cannot establish that he suffered clear, manifest, and undue prejudice by the inclusion of Varela's duress defense in his trial because, as the appellate court notes, "the jury, in convicting Varela, indicated that it did not believe her defense and did not find her to be a reliable witness."  Thus, Cardenas is not entitled to federal habeas relief on this claim.

*Claim 2.  Batson Violation*

Cardenas next argues that the trial court erred in denying his challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), to the prosecution's peremptory striking of a Latina juror.  Cardenas contends that "[t]he prosecutor's reasons for excusing this conspicuously neutral juror with ties to law enforcement are quite suspect.  The inference of group bias continues to preponderate in this case despite the prosecutor's proffered reasons."

In challenging a Latina juror during voir dire, the prosecutor stated:

> Ms. [M.E.], she's a file clerk at Kaiser Hospital.  She's 39 years old.  Seems to me, she didn't have a heck of a lot of life experience.  Pretty soft-spoken to me, and I have better jurors coming behind her, including Ms. [M.L.] and Ms. [M.A.], and I hit the next six or seven jurors are rated pretty good jurors to me too.
> So I have reasons that had nothing to do with whatever her ethnicity may be to get a better juror up here, and that's what I've got now, and both of her replacements are female.

Varela's counsel objected to the prosecutor's reasons, stating:

> Ms. [M.L.], who counsel says is a better juror, and has more life experience than Ms. [M.E.] . . . is a juror who said she's not sure she can remember what's being said.  She's asked if she could have a tape recorder so that she could remember the testimony because she has difficulty following it.

10

I don't know how to put it charitably, but I submit, that is not a genuine reason.  I would note that Ms. [M.E.] is 39 years old.  She was married.  She has a daughter.  She's a mother, a single mother.  Her mother was involved in the Police Activities League.

We have many other jurors who are file clerks, or similar jobs.  They're certainly, um, nothing more experienced than her.  She has several family members who their questionnaire reveals, are in law enforcement; several family friends she specifically mentioned.

So I submit, there's no basis whatsoever for as the Court and counsel stated, reasons with regard to Ms. [M.E.].

The trial court then stated, "Your *Batson* motion will be denied."

The appellate court rejected Cardenas's *Batson* claim on direct appeal of his conviction:

We disagree with the assertion that the prosecutor's reasons for challenging M.E. were obviously pretextual.  The record reflects that M.E. had worked at the same clerical job for the same employer for 19 years, since she was approximately 20 years old.  These facts certainly support the prosecutor's conclusion that M.E. did not have a great deal of life experience.  We note that the focus of the prosecutor's questions to M.E. during voir dire was on her job description and work experience, which suggests that he considered them important.

Also, that M.E. had friends who had worked for the police or sheriff's department did not necessarily add greatly to her life experience.  The facts that M.E. had been married and had a child, and that her ex-husband was an alcoholic, obviously added some additional depth to her life.  However, these facts clearly are not so staggeringly demonstrative of life experience such as to undermine the prosecutor's stated reason for striking M.E.  In addition, the prosecutor's comment that M.E. was "pretty soft spoken" further reflects his impression that she was not a particularly dynamic potential juror.

The court additionally rejected on direct appeal Cardenas's assertion that comparing two jurors who were not challenged by the prosecutor and ultimately served on the jury reveals that the prosecutor proffered pretextual reasons for challenging M.E.  The court concluded that juror M.L.'s request for a tape recorder "does not demonstrate a flawed juror so much as a conscientious one concerned about missing anything said during the lengthy trial" and that another juror had "successful jury experience" and "several characteristics that were distinctive from those of M.E."

11

The appellate court further noted other circumstances that supported the trial court's finding that no racial bias had occurred:

> [A] second Hispanic juror, Mr. M.I., was a member of the jury panel at all times when the prosecutor was using his peremptory challenges and the prosecutor did not challenge him, even though, as respondent notes, the prosecutor used only some 10 of his·20 available peremptory challenges during jury voir dire.  In addition, while Cardenas and Trujillo point out that M.E. was of the same race as defendants, they fail to note that both the victim and two prosecution witnesses (Ponce and Rodriguez) were also Hispanic, which arguably would make a Hispanic juror more desirable for the prosecutor.

The Equal Protection Clause prohibits purposeful racial discrimination in the selection of the jury.  *Batson v. Kentucky*, 476 U.S. 79, 86 (1986).  In *Batson*, the Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause: 1) a defendant raising a *Batson* claim must establish a *prima facie* case of discrimination; 2) once a *prima facie* case of discrimination is established, the burden of offering race-neutral reasons for the strikes shifts to the prosecutor; 3) after the prosecutor offers race-neutral reasons, the trial court has the duty to determine if the defendant has established purposeful discrimination.  *Paulino v. Harrison*, 542 F.3d 692, 699 (9th Cir. 2008) (citing *Batson*, 476 U.S. at 98).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" regarding *Batson* claims that "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (quoting *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)).  Under AEDPA, a federal habeas court may only grant relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge."  *Rice v. Collins*, 546 U.S. 333, 338 (2006).  This "standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that the trial court's

credibility determination was supported by substantial evidence, we must uphold it." *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012).

Although the record indicates that the trial court did not state its reasons for accepting the prosecutor's proffered reasons, on direct appeal, the Court of Appeal undertook a lengthy analysis of Cardenas's claim before ultimately rejecting it. That analysis survives deferential federal habeas scrutiny. The court did not unreasonably apply *Batson* or its progeny in exploring and evaluating the prosecutor's conduct. Based on the record before this Court, there is no basis to find that the state court's denial of Cardenas's *Batson* claim was unreasonable, and Cardenas is not entitled to relief on this ground.

<u>Claim 3. Biased Juror</u>

Cardenas additionally argues that the trial court erred in failing to discharge for cause a juror who expressed "[v]isceral fears of one's family being tracked down by the defendants, which [the juror] could not promise to disregard and which plainly carried over to" Cardenas.

In considering this claim on direct appeal, the Court of Appeal laid out the following facts:

> At the start of proceedings on Wednesday, May 21, 2008, after the jury had been sworn but before alternates had been selected, the court called in juror number eight, A.P., whom the court understood to have "an issue." A.P. said that the previous Friday, he thought he remembered Trujillo's attorney saying that his client was "charged because he's the one who pulled the trigger." When Trujillo's attorney denied saying anything like that, A.P. said, "maybe I misheard him, and then I am of the opinion this weekend that if he was the one that pulled the trigger, then he might be guilty. [¶] Also, my next concern is that because it's a gun-related case, I'm . . . concerned about the safety of my family, and that's all, your Honor."
> After reminding A.P. that he was under oath, the court questioned him as follows: "THE COURT: Are you telling this Court and these parties that you have formed an opinion already as to the guilt of one of these people based on what they're charged with?

"THE PROSPECTIVE JUROR: Um, maybe because, Your Honor, that if—if I heard it right Friday, that one of the defendants was the triggerman, maybe, maybe I misheard it.  That's why I formed the opinion."

After reminding A.P. that he had said during voir dire that he could follow the law relating to evidence of guilt, A.P. again said he had formed the opinion after mishearing the lawyer.  The following exchange then took place between the court and A.P.:

"THE COURT: When you put [that opinion] aside, are you going to sit as a fair juror in this case?

"THE PROSPECTIVE JUROR: I'll try my best, Your Honor, because I guess I misheard the lawyer about it.

"Well, my second concern, Your Honor, is that because it's a gun-related [sic], I'm concerned about the safety of my family.  That's my next concern."

When the court asked if anyone had threatened A.P., he responded, "Well, I just have a feeling right now, Your Honor.  [¶] . . . [¶]  That maybe, you know, if because it's a gang-related case, you know I have this wild imagination that maybe in the afternoon, someone would follow me to my house and everything, you know, something like that."

Trujillo's attorney then questioned A.P., first asking if he could have gotten the impression that Trujillo was the "triggerman" from the clerk reading the information in which Trujillo was described as someone who used a firearm in the commission of the offense.  A.P. said he was not sure, and the following exchange took place between counsel and A.P.:

"MR. COFFER [Trujillo's counsel]: But it is a fact that after you heard this Information [sic] from whatever source you received it, you began to think about that fact, the fact that a gun was allegedly used and that my client used it; is that correct?

"THE PROSPECTIVE JUROR: Yes.

"MR. COFFER: And you've been thinking about that fairly continuously or continually over the weekend; is that true?

"THE PROSPECTIVE JUROR: Yes.

"MR. COFFER: And now you come in here and its been, um, weighed on your mind to such an extent that you now believe you cannot be a fair juror and that's why you've asked to see the Judge?

"THE PROSPECTIVE JUROR: Yes.

"MR. COFFER: Do you really think you can give my client a fair trial now that you had to think about it in the way you described [sic]?

"THE PROSPECTIVE JUROR: Well, not that if now that I think I misheard the statement, then I'll probably do my job; still in the back of my mind, but I'll try my best.

"MR. COFFER: Well, you'll try your best.  Previously, you had sworn that you would be able to give my client a fair trial.  Now you have some doubts about that; is that what you are saying?

"THE PROSPECTIVE JUROR: Um, a little bit, you know, I-I have to be-I have to tell the truth, maybe a little bit, yes."

14

Trujillo's counsel told the court that he was challenging A.P.: "Well, [A.P.] hasn't a solitary fact in this case.  He already told us he's somewhat prejudiced against my client at this point."  Then, outside the presence of A.P., counsel said he was moving for a mistrial, explaining: "It appears to me quite clear that [A.P.] has formed an opinion about my client in particular.  It's not just an opinion; that would be bad enough, but it's an opinion that's accompanied with a level of fear of my client, that apparently, at least as I interpret [A.P.'s] comments, that my client might hunt him down or trail him or track him to his home and harm him or his family.

"So [A.P.] is not only concerned about himself in relation to my client, but he's also concerned about his family in relation to my client.  He knows . . . that this is a gang-related case, and even if Mr. Trujillo could not give him harm, he might well fear that his gang friends might . . . come to his home and harm him.

"These are thoughts he's been having, he tells us, throughout the weekend, since Friday, and I don't know how we can rehabilitate [A.P.] at this point to make him a fair juror, to have the kind of open mind we want, the kind of impartiality that we have in a case as serious as this, so I am asking for a mistrial."

Both Cardenas's and Varela's attorneys joined in the motion for a mistrial.  The prosecutor said he opposed the motion for a mistrial.  The trial court then denied the purported challenge for cause and the motion for a mistrial.

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).  While "[d]oubts regarding bias must be resolved against the juror," *United States v. Martinez-Martinez*, 369 F.3d 1076, 1082 (9th Cir. 2004), a defendant "bears the burden of showing that a juror was actually biased against him or her and that the district court abused its discretion or committed manifest error when it failed to excuse the juror for cause," *United States v. Hanley*, 190 F.3d 1017, 1030 (9th Cir. 1999) (internal quotation marks and alteration omitted).  "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel."  *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977).

However, Cardenas fails to demonstrate the existence of juror bias.  As the Court of Appeal recognized when it denied this claim on direct appeal, on balance, the juror's responses

15

did not demonstrate bias.  "Although he never gave a guarantee that he would be unbiased, once

his misapprehension was corrected and despite his safety concerns, [the juror's] responses to the

court and counsel's questions reflect that he intended to do his best to give [the defendants] a fair

trial."  Even if his responses were somewhat uncertain, his responses as a whole showed a

willingness to set aside his personal views and decide the case based on the evidence.

Moreover, a trial judge's finding that a juror was not biased is a factual finding presumed

to be correct because "resolution [of the juror impartiality issue] depends heavily on the trial

court's appraisal of witness credibility and demeanor."  *Thompson v. Keohane*, 516 U.S. 99, 111

(1995); *see, e.g.*, *Wainwright v. Witt*, 469 U.S. 412, 428-29 (1985); *Patton v. Yount*, 467 U.S.

1025, 1038 (1984).  This presumption of correctness also applies to implicit factual findings.

*Tinsley v. Borg*, 895 F.2d 520, 525 (9th Cir. 1990).  Here, Cardenas's bare assertion that the juror

was biased does not meet his burden of adducing clear and convincing evidence sufficient to

overcome the presumption of correctness afforded the trial court's finding of impartiality.  *See*

28 U.S.C. § 2254(e)(1).  Accordingly, the state court's rejection of Cardenas's juror bias claim

did not contravene or unreasonably apply federal law, and Cardenas cannot prevail on this claim.

*Claim 4: Legal Insufficiency of Gang Enhancements*

Cardenas next argues that the jury's gang findings were unsupported by substantial

evidence.  Cardenas asserts that "[e]vidence of specific intent to assist criminal conduct by gang

members is an undue stretch here."

To sustain a jury's gang enhancement finding, "there must have been evidence upon

which a rational trier of fact could find that [the petitioner] acted with the 'specific intent to

promote, further, or assist in' *some* type of 'criminal conduct by gang members,' which may

include the crimes of conviction." *Emery v. Clark*, 643 F.3d 1210, 1216 (9th Cir. 2011) (per

curiam) (citation omitted).  The Ninth Circuit previously held in *Garcia v. Carey*, 395 F.3d 1099

(9th Cir. 2005), and *Briceno v. Scribner*, 555 F.3d 1069 (9th Cir. 2009), that the "gang

enhancement can only be applied when the defendant had the specific intent to facilitate gang

members' criminal activities *other than* the charged crime."  *Emery*, 643 F.3d at 1215.  The

California Supreme Court explicitly disapproved of that interpretation in *People v. Albillar*, 244

P.3d 1062 (Cal. 2010), and the interpretation is no longer binding in this Circuit.  *See Emery*, 643

F.3d at 1215-16 (recognizing "that the California Supreme Court has overruled *Briceno* and

*Garcia's* interpretation of [California Penal Code] section 186.22(b)(1)" and applying "the

California Supreme Court's authoritative interpretation of section 186.22").  Thus, "[t]here is no

further requirement that the defendant act with the specific intent to promote, further, or assist a

*gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct

by *gang members*."  *Albillar*, 244 P.3d at 1075-76 (citations omitted).

    In this case, much of the evidence that Cardenas's acts were gang-related and thus were

subject to the gang enhancement were provided by a gang expert, Detective McCoy, who

testified that Cardenas was a Norteno gang member.  Cardenas challenged McCoy's testimony in

part, as discussed in claim 5, *infra*, but the appellate court concluded that, even excluding the

challenged testimony, sufficient evidence supported the gang enhancement:

> In the present case, the following admissible evidence—assuming for present
> purposes that Detective McCoy's challenged testimony was improperly admitted into
> evidence—was sufficient to prove that defendants' actions in committing this offense
> satisfied the elements of subdivision (b)(1) of section 186.22.  First, there was properly
> admitted testimony by McCoy that the Nortenos are a criminal street gang that engages in
> criminal activities, primarily robbery, murder, assault, and auto theft, among other things.
> McCoy also testified that Surenos are a rival street gang to the Nortenos.

Second, there was a variety of evidence demonstrating that all three defendants were Norteno gang members. Both McCoy and Steve Young, whom McCoy described as part of the Norteno leadership, testified that Trujillo and Cardenas were Nortenos. McCoy testified that Cardenas had admitted to police that he was a Norteno. Cardenas testified that he had associated with northerner gang members in his neighborhood, had admitted a gang enhancement in a plea bargain to avoid prison, and had told authorities in prison that he was a northerner because he had grown up with northerners.

. . . .

Third, although the allegedly inadmissible testimony might have supported a finding that the murder was committed "for the benefit of" or "at the direction of" the gang, there was a great deal of significantly stronger admissible evidence showing that the murder was committed "in association with" the gang. As previously discussed, admissible evidence showed that the three defendants were Norteno gang members who acted together in the commission of this crime. Furthermore, McCoy testified that robbery, assault, and murder are all primary criminal activities of Nortenos. In addition, Varela testified that Trujillo told her to go into the Mexico Lindo Bar—which both McCoy and Torres-Morales testified was frequented by Surenos—to "pick up some guys that have money." While Trujillo did not specifically mention robbery, Varela believed that was the plan. Torres-Morales testified that Varela talked about setting up Rodriguez, Ponce, and Castillo Ramirez that night. McCoy testified that all three men were Sureno gang "associates," with Ponce and Rodriguez involved in gang-related methamphetamine sales. Torres-Morales testified that Rodriguez had said he was a gang member of a southerner clique, and Ponce was a "tag-along" with Rodriguez.

Young testified that, shortly before the shooting, Cardenas had said something to him on the phone about Varela "going with some guys" and "pulling some bullshit." Young further acknowledged at trial telling the police after his arrest that he had assumed there was going to be a robbery or assault. The testimony of several witnesses, including Rodriguez, Ponce, and Varela, further showed that, at Trujillo's direction, Varela took the three men to a dark, isolated location in the apartment complex on Dana Drive, where Trujillo and Cardenas came up to them suddenly; Trujillo was holding a gun and Cardenas had, according to Varela, something "black and long"—presumably the pry bar—in his hands. Rodriguez also testified that, after he was knocked out and then began to regain his senses, he felt someone patting him down or going through his pockets. Finally, after the shooting, both Varela and Young testified that they heard Trujillo say that he "got that fool," referring to his shooting of Castillo Ramirez. Young believed Trujillo was boasting about the shooting when he said that.

Moreover, this same substantial evidence supports the finding that each defendant specifically intended to assist fellow gang members in committing the planned assault and/or robbery.

In sum, admissible evidence showed that the three defendants, all Norteno gang members, acted together in targeting patrons of a Sureno bar who had Sureno ties for robbery and/or assault, with a murder resulting. The evidence also showed that robbery, assault, and murder are all primary criminal activities of Nortenos. [T]his evidence plainly was sufficient to support the findings that the crime was committed "in

18

association with any criminal street gang, with the specific intent to . . . assist in any criminal conduct by gang members."

The Court agrees with the state court's determination that there was sufficient admissible evidence to prove the elements required for finding a criminal street gang enhancement. In viewing the evidence in the light most favorable to the prosecution, a jury could reasonably infer that Cardenas committed the charged offenses beyond a reasonable doubt "in association with" the Norteno gang and that he did so "with the specific intent to promote, further, or assist in any criminal conduct by gang members" pursuant to Penal Code § 186.22(b)(1). *See also People v. Romero*, 43 Cal. Rptr. 3d 862, 865 (Cal. Ct. App. 2006) (explaining that § 186.22 enhancements may be proven with expert testimony about criminal street gangs). Cardenas's contention that the prosecution failed to establish the requisite specific intent is without merit. *See Emery*, 643 F.3d at 1215 (sufficient evidence existed to satisfy specific intent component of gang enhancement where defendant assisted fellow gang member in committing underlying crime); *Bonilla v. Adams*, 423 F. App'x 738, 739-40 (9th Cir. 2011) (testimony that defendant committed a robbery with two other gang members and expert testimony that explained in hypothetical terms how such offenses could be useful to the gang as a whole was sufficient to establish specific intent element of gang enhancement).

Accordingly, because Cardenas fails to establish by clear and convincing evidence that the state court's factual findings were erroneous and the record does not compel the conclusion that no rational trier of fact could have found proof that the shooting was committed with the intent to benefit a street gang, Cardenas cannot prevail on this legal insufficiency claim.

*Claim 5.  Improper Gang Expert Testimony*

19

Cardenas likewise contends that the gang expert's testimony and the court's rulings restricting cross-examination of the gang expert violated his rights to due process, a fair trial, and confrontation.

Under California law, expert testimony on criminal street gangs is admissible to prove the elements of the criminal street gang substantive offense and the gang enhancement. *See People v. Jasso*, 150 Cal. Rptr. 3d 464, 484 (Cal. Ct. App. 2012) (relying on expert testimony in part to support a conviction for the substantive offense); *see also People v. Hernandez*, 94 P.3d 1080, 1085 (Cal. 2004) ("In order to prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs."). Cardenas nonetheless argues that the admission of the gang expert's testimony that the crimes had been planned at a gang meeting was error because: 1) the court did not permit cross-examination about the basis of the opinion in violation of his confrontation rights; and 2) the testimony "amounted to ultimate opinions on intent and guilt."

A.      Limitation of Cross-Examination

When asked why he believed that the offense was committed "at the direction of, for the benefit of, or in association with the criminal street gang known as the Nortenos," Detective McCoy answered:

> Being familiar with the case, and the way the Norteno, Northern Structure, Nuestra Familia conducts business, I believe my understanding is that there was a meeting that took place prior to this incident of Northern Structure and Norteno members at [Fairlas Records] where something of this nature was planned.
> The individuals involved then went out and conducted that plan.  They went and looked for individuals that they wanted to assault, rob, and if it needed to be, killed . . . .

McCoy further testified that he learned about the meeting from his interviews with Varela and the bartender, Leticia Torres-Morales, and that he knew nothing about what happened at the meeting other than what he had heard from Varela and Torres-Morales.  The defense did not object to this testimony.

On cross-examination by counsel for Cardenas and Varela, the prosecutor objected on hearsay grounds to questions regarding what was said at the meeting, and the court sustained the objections.  Varela's counsel then moved to strike McCoy's testimony about the meeting at Fairlas Records, citing the Confrontation Clause and arguing that "we're being denied our right to cross-examine the witness as to the full basis of that answer."  The court stated, "I'm going to deny it.  It's untimely.  Had you objected at the time, I might have sustained the objection, as I am doing now, but you did not."

On direct appeal, the appellate court agreed with Cardenas that: 1) the trial court improperly refused to permit defense counsel to cross-examine McCoy about the factual basis for his belief that a meeting had taken place where the plan to commit robbery and assault was formed, and 2) the court should have granted the motion to strike McCoy's testimony on the

subject.  The court ultimately determined, however, that the error was not prejudicial "because there was other strong evidence presented at trial—including testimony that McCoy properly offered as well as a great deal of additional evidence—that demonstrates beyond a reasonable doubt that the murder resulted from a plan by these three Norteno gang members, acting 'in association with the gang,' to rob and/or assault men who were lured from a Sureno-associated bar."

As previously discussed in claim 4, *supra*, the properly-admitted evidence supporting the gang enhancements was overwhelming even without considering Detective McCoy's improper testimony about the Fairlas Records meeting.  Cardenas therefore cannot demonstrate that he was prejudiced by the testimony, and he is not entitled to relief on the trial court's evidentiary error.  Morever, Cardenas cannot demonstrate a confrontation violation because the declarants, Varela and Torres-Morales, appeared for cross-examination at trial.  *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.").  Cardenas is therefore not entitled to relief on the trial court's evidentiary error.

B.     Opinion on Ultimate Issues

Cardenas additionally argues the "gang expert also offered unduly case- and defendant-specific testimony that amounted to ultimate opinions on intent and guilt."  He argues that this testimony violated state law, but federal habeas relief is not available for errors of state law.  *Estelle*, 502 U.S. at 67-68.  He additionally argues that the testimony deprived him of due process in violation of federal law, but under federal law, there is no support for "the general proposition that the Constitution is violated by the admission of expert testimony concerning an

22

ultimate issue to be resolved by the trier of fact." *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009). " [I]t is 'well-established . . . that expert testimony concerning an ultimate issue is not per se improper.' Although '[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact.'" *Id.* (internal citations omitted); *see also Duvardo v. Giurbino*, 410 F. App'x 69, 70 (9th Cir. 2011) (noting that the Supreme Court "has never held that the admission of expert testimony on an ultimate issue to be resolved by the trier of fact violates the Due Process Clause"); *Briceno*, 555 F.3d at 1077-78 (rejecting claim that gang expert's testimony that "the crimes [the defendants] were involved in benefit the gang itself, the action that they have done to glorify the gang" was unconstitutional because "there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue"). Cardenas therefore cannot prevail on that argument either.

*Claim 6.  Instructional Error*

Cardenas additionally asserts that "the court erred prejudicially in failing *sua sponte* to instruct the jury in accordance with any instruction which informed the jury that evidence of an oral admission of a defendant should be viewed with caution."

With regards to Young's testimony about statements the defendants allegedly made, the trial court instructed the jury:

> You have heard evidence that defendant[s] Jesus Trujillo and Isabel Varela made an oral or written statement before the trial.[2]  You must decide whether or not these defendants made any such statement in whole or in part.
>
> If you decide that the defendants made such a statement, consider the statements along with the other evidence in reaching your verdict.  It is up to you to decide how much importance to give such a statement.

That instruction comports with the standard version of CALCRIM No. 358 except that it omits the following: "Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded."  CALCRIM No. 358.  This portion of the instruction must be given *sua sponte* when there is evidence that the defendant made an out-of-court oral admission or confession before trial.  Bench Note to CALCRIM No. 358, "Instructional Duty" (citing *People v. Beagle*, 492 P.2d 1 (Cal. 1972). Because it determined that the out-of-court statements attributed to Cardenas "ha[d] the potential to be seen as incriminatory by a jury, especially given Young's interpretation that a robbery or assault was going to take place," the appellate court agreed with Cardenas that the trial court should have instructed the jury to view the defendants' admission with caution.  The court nonetheless concluded that the error was harmless.  Cardenas argues that such conclusion is incorrect because the error "denied him his due process liberty interest in the correct application of state law and resulted in a fundamentally unfair trial."

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380

---

[2]      Cardenas does not in his Petition—nor did he on direct appeal—address the fact that the court's instruction only mentions Trujillo and Varela by name.  This Court will, like the appellate court, presume that for purposes of this argument that Cardenas is also claiming that the trial court should have included his name in the instruction.

(1990).  It is well established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record.  *Estelle*, 502 U.S. at 72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn.  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation."  Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law.  *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process."  *See id.* at 156-57; *Estelle*, 502 U.S. at 72.

Cardenas fails to demonstrate that he was denied a fair trial.  As the appellate court noted, the record indicates that the prosecutor repeatedly told the jury during closing argument that Young's statements should not be trusted.  Likewise, the jury was instructed to view Young's testimony with caution if it determined that Young was an accomplice.  The record indicates that the jury had good reason to believe that Young was an accomplice.  The jury was similarly instructed that, in evaluating the credibility of a witness, it could consider certain factors, many of which made Young a suspect witness: Young had multiple felony convictions, admitted lying to the police, and was promised leniency in exchange for his testimony.  Finally, as the appellate court found, Cardenas's testimony about what was said in their conversation was "strikingly

25

similar" to Young's testimony and Cardenas's statements were as consistent with his defense and the prosecution's theory.  Accordingly, the failure of the court to properly instruct the jury as to CALCRIM No. 358 did not violate Cardenas's due process rights, and he is not entitled to relief on this ground.

*Claim 7: Cumulative Error*

Cardenas next claims that the cumulative effect of the errors he asserts deprived him of due process and a fair trial.

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness."  *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)).  Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence  in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted).  In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process.  *See Chambers*, 401 U.S. at 294.

As discussed above, Cardenas does not allege any claims that amount to errors of constitutional dimension.  Accordingly, he demonstrates no errors that can accumulate to a level of a constitutional violation, and the state courts therefore did not unreasonably deny him relief on this claim.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

_Claim 8.  Cruel and Unusual Punishment_

Finally, Cardenas contends that his "effective [life without parole] term of 51 years to life . . . violates state and federal cruel and unusual punishment standards."  Pet. at 42.  He further asserts that, "at a minimum, the uniquely severe mandatory term of 25 years to life for vicarious gang firearm use—on top of vicarious felony murder liability—is excessive."

The Court of Appeal also rejected this claim on direct appeal after applying a "three-pronged approach" under California state law to determine whether Cardenas's sentence is grossly disproportionate to the crime committed.

The Eighth Amendment, applicable to the States through the Fourteenth Amendment, proscribes the infliction of "cruel and unusual punishments."  U.S. CONST. amend. VIII; _Kennedy v. Louisiana_, 554 U.S. 407, 419 (2008).  In determining whether to infer gross disproportionality, a federal court should examine whether a petitioner's sentence is justified by the gravity of his triggering offense and his criminal history, a process similar to the three-pronged approach employed by California state courts.  _See Ramirez v. Castro_, 365 F.3d 755, 768 (9th Cir. 2004).  Where the crime is murder, even a life sentence without parole is not grossly disproportionate.  _See Harris v. Wright_, 93 F.3d 581, 584-85 (9th Cir. 1996) (life imprisonment without possibility of parole for aggravated first-degree murder raises no inference of gross disproportionality); _United States v. LaFleur_, 971 F.2d 200, 211 (9th Cir. 1991) ("Under _Harmelin_ [_v. Michigan_, 501 U.S. 957 (1991)], it is clear that a mandatory life sentence for murder does not constitute cruel and unusual punishment.").  Furthermore, while the contours of the "gross disproportionality principle" have been called "unclear," the principle is applicable only in the "exceedingly rare" and "extreme" case.  _Lockyer v. Andrade_, 538 U.S. 63, 72-73

27

(2003); *see also Rummel v. Estelle*, 445 U.S. 263, 272 (1980) ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.").

Cardenas cannot demonstrate that this is one of the exceedingly rare cases in which the sentence imposed raises an inference of gross disproportionality when compared to the crime and relevant criminal history.  The Court of Appeal reasonably rejected his contention that the sentence is excessive in light of the facts that "he was 27 years old at the time of sentencing and that he 'does not have a particularly lengthy or violent history and his assaultive behavior is related to alcohol; his only violent conviction is a juvenile fight almost ten years earlier.'"

Cardenas urges this Court to "distinguish between offenders who merit parole consideration within their lifetime and those who do not."  The U.S. Supreme Court's recent decision in *Miller v. Alabama*, 132 S. Ct. 2455, 2463 (2012), arguably lends some support for Cardenas's argument that a sentence that effectively imposes life without the possibility of parole is presumptively unfair where the defendant did not himself commit murder.  Of course *Miller's* holding that mandatory life imprisonment without parole violates the Eighth Amendment's prohibition on cruel and unusual punishment is expressly limited to juvenile offenders, and the Court reaffirmed "that a sentencing rule permissible for adults may not be so for children."  *Id.* at 2470.

In short, the Court of Appeal's finding that the trial court's sentence was not grossly disproportionate to the crime for which Cardenas was convicted in light of the circumstances of the instant offense was not contrary to, or an objectively unreasonable application of, any clearly established federal law and was not based upon an unreasonable determination of the facts in

light of the evidence presented.  Accordingly, Cardenas is not entitled to habeas relief on his Eighth Amendment claim.

## V. CONCLUSION AND ORDER

Cardenas is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: April 2, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge